# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-00739-SCT

*JUSTIN McPHAIL*

*v.*

*COLLETTE E. McPHAIL*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/24/2021 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| TRIAL COURT ATTORNEYS: | HELEN BAGWELL KELLY |
| | LUTHER PUTNAM CRULL, JR. |
| | T. SWAYZE ALFORD |
| | WILLIAM RUFUS WHEELER, JR. |
| | JAMES ROGER FRANKS, JR. |
| | CORY MICHAEL WILLIAMSON |
| | EDWARD D. LANCASTER |
| | JAY GORE, III |
| | GINGER M. MILLER |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JUSTIN McPHAIL (PRO SE) |
| | CORY MICHAEL WILLIAMSON |
| ATTORNEY FOR APPELLEE: | JAY GORE, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED AND REMANDED - 02/23/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Justin McPhail appeals from the Grenada County Chancery Court's February 2021 order finding him in willful, continued, contumacious contempt for nonpayment of child support and refusal to complete a psychological evaluation to its conclusion, thus denying his motion to be released from incarceration. The chancery court's February 2021 order

follows this Court's December 2020 order directing the chancery court to (1) make a written determination as to Justin's ability to pay the financial obligations imposed upon him by the chancery court; (2) make a written determination as to the exact requirements necessary for Justin to be released from incarceration; and (3) provide written findings of fact and conclusions of law regarding these two issues sufficient to allow for review should an appeal be filed. En Banc Order, *McPhail v. McPhail*, No. 2020-CA-00739-SCT (Miss. Dec. 7, 2020).

¶2. The only issue Justin asserts on appeal is whether the chancery court "abused its discretion by not applying the law, and making a decision that was manifestly unreasonable by ordering [Justin] to undergo a mental health evaluation despite no record of a mental health deficiency." Justin argues that "order[ing] a party to submit to a psychological review is an invasion of his right to privacy." Justin submits that under "Strict Scrutiny analysis the Order of testing must be necessary to further a compelling state interest and narrowly tailored to that end." Justin asks this Court to hold that the chancery court's "ordered psychological examinations were not substantially related to a state interest."

¶3. We may not consider Justin's claim that the chancery court's order was either void or unconstitutional. Justin did not properly challenge the order in the chancery court on those grounds, and he cannot do so now. *Tinnon v. Martin*, 716 So. 2d 604, 610 (Miss. 1998); *Ladner v. Ladner*, 206 So. 2d 620, 623 (Miss. 1968), *overruled on other grounds by Bubac v. Boston*, 600 So. 2d 951 (Miss. 1992)); *Masonite Corp. v. Int'l Woodworkers of Am.*, 206

So. 2d 171 (Miss. 1967).

¶4.    The only question before us is whether Justin violated the chancery court's prior orders as found by the chancery court's February 2021 contempt order. *Ladner*, 206 So. 2d at 623. Having carefully considered the record, we must affirm the chancery court's order finding Justin guilty of contempt.

## FACTS AND PROCEDURAL HISTORY

¶5.    Justin and Collette McPhail divorced in 2012, sharing joint physical and legal custody of their minor son. In 2015, Collette filed a petition for modification of custody and a citation for contempt. Justin filed a response denying the allegations and asserting a counterclaim for contempt. Protracted litigation ensued, and a guardian ad litem (GAL) was appointed who later recommended to the chancery court that Justin submit to a drug test and that a mental health professional be appointed to evaluate the family.

¶6.    In January 2018, the chancery court ordered both parties to submit to hair-follicle drug testing within ten days from the date of the order. The court also ordered each party and the GAL to submit the name of a properly licensed and credentialed psychologist or psychiatrist to the court within ten days to be designated by the court to evaluate the mother, the father, and the child. The court ordered both parties to share the costs equally.

¶7.    Justin did not submit to a drug test and did not submit the name of a mental health professional. In April 2018, a show-cause hearing was held to determine if Justin should be held in contempt for failure to comply with the court's order. The chancery court heard

3

testimony from both parties.[1]

¶8.   At the start of the hearing, Justin (who was then proceeding pro se) sought to cross-examine Collette about her mental health history.  The chancery court informed Justin that Collette's mental health was not relevant then because the hearing that day was a show-cause hearing to determine if Justin should be held in contempt.

¶9.   Justin then testified that he did not get a drug test because the "drug testing industry is plagued with bias and conflict of interest."  And "there are too many people that stand to see me lose from a negative drug test."

¶10.   Justin said he did not submit the name of a psychologist because "[t]he psychological evaluation is bullshit[.]"  He then stated, "[h]ow can I be asked to have my son submit to something that I think would be harmful to him for one thing?"  Justin later told the court that he would be open to a psychological evaluation at the proper time but that the proceedings had been too rushed, and "we need to evaluate [the] evidence that we have" regarding the custody-modification matter.

¶11.   When asked why he was $1400 in arrears for child support, Justin told the court: "Well, I guess a reduction of income would be stating the obvious.  I mean, what else is there?"

¶12.   The chancery court found by clear and convincing evidence, which included Justin's

---

[1] According to the record, Justin brought his then-twelve-year-old son to the hearing, knowing that he was going to be held in contempt of court.  The chancery court had the son removed from the courtroom shortly after the proceedings began.

own testimony, that Justin did not comply with the court's orders that he submit to a drug test and provide the name of a licensed psychologist or psychiatrist for the court to consider for appointment. The court further found that although Justin claimed an inability to pay his child support, he failed to demonstrate with particularity his inability to do so. *See **Hooker v. Hooker***, 205 So. 2d 276, 278 (Miss. 1967) (A parent may exonerate themself from failure to make child support payments because of their inability to pay, "but [this] evidence must be made with particularity and not in general terms." (citing ***Kincaid v. Kincaid***, 213 Miss. 451, 57 So. 2d 263 (1952)).

¶13. The chancery court ordered that Justin be held in the Grenada County jail until such time as he has purged himself of contempt of all prior orders, including submitting to the drug test previously ordered, providing the name of a proposed psychologist or psychiatrist to the court for appointment, and paying $1400 in child support.

¶14. Later in April 2018, the chancery court appointed Dr. Paul Leonard, a psychologist recommended by the GAL and Collette. The order instructed Dr. Leonard to evaluate the minor child, Collette, and Justin along with any other family members deemed necessary by Dr. Leonard in the best of interest of the child and to report his findings to the chancery court.

¶15. In June 2018, upon the appointment of Dr. Leonard, the chancery court issued an order finding its previous order requiring that Justin provide the name of a psychologist to be moot. The chancery court also found that due to Justin's incarceration and the extensive

5

time that had passed that would likely "taint a hair follicle test for drugs," its previous order requiring a drug test was moot. The court held that it would draw a rebuttable negative inference at the custody-modification trial that had Justin submitted to drug testing as ordered, the results would not have been favorable to him. In a written order, the chancery court held that Justin may be released from custody upon the fulfillment of his child support obligations and payment of attorneys' fees previously awarded to Collette.

¶16. In the same order, the chancery court instructed that both parties and the minor child were to submit to psychological testing by Dr. Leonard on or before July 20, 2018. And if Justin was still incarcerated at that time, sheriff personnel was to transport Justin to Dr. Leonard's office.

¶17. When a sheriff's deputy prepared to take Justin to the psychologist, Justin refused to attend unless certain conditions were met. Justin also filed an "Affidavit of Conditions" with the court. These conditions were (1) that Justin be given a "Release on his own Recognizance (ROR)" and that he be allowed to drive himself to the appointment; (2) that the entire appointment be recorded and that this recording be given to Justin at the end; (3) that the cost for the appointment be paid by someone other than Justin; and (4) that all of this be in writing stating that he was not relinquishing his constitutional rights and that it be recorded by the court.

¶18. A hearing was held in August 2018 to address Collette's July 2018 motion for contempt and other relief as well as Justin's "ex parte request for injunctive relief." At the

hearing, Justin told the chancery court that he did not refuse the psychological evaluation on the basis that he did not think it was relevant. Rather, he felt "it should be recorded because [Collette] has a history of psychological issues." Justin said he wanted a recording of his psychological examination available for court records so it could be reviewed by an independent psychologist or psychiatrist for a second opinion.

¶19. The chancery court told Justin that its previous order did not allow him to refuse the examination unless certain conditions were met. The court explained that it did not have the authority to tell the psychologist how to conduct the examination and that the cost of the examination had already been paid by Collette. The court then found that Justin remained in contempt and in arrears for child support.

¶20. At a status hearing in October 2018, Justin agreed to submit "unconditionally" to a psychological evaluation. The chancery court entered an order stating that "[u]pon good faith completion of the evaluation" and "notice from Dr. Leonard that the evaluation is complete," it would hold a hearing to consider any evidence from Justin "with the particularity required by law for a determination of inability to pay child support arrearage and other amounts previously ordered to be paid by him."

¶21. In November 2018, Justin was transported to Dr. Leonard's office by a sheriff's deputy. According to the record, Dr. Leonard interviewed Justin for some length, but Dr. Leonard stated in his report that Justin "refused to complete psychological testing, stating he wanted to end the evaluation."

¶22.   Afterwards, Justin filed a motion, styled a "Motion to Assert with Particularity Defendant's Present Inability to Pay Child Support, for Release from Incarceration and for Other Relief."  In the motion, Justin claimed that he had participated in a psychological evaluation as previously ordered by the court.  And having participated in the evaluation, he would show with particularity his current inability "to pay the accrued child support arrearage the court required to secure his release from incarceration."

¶23.   A hearing was held on the motion in January 2019, at which Justin was questioned at length with regard to his financial status.  When asked about Dr. Leonard's report that he refused to complete the psychological testing, Justin claimed he did not end the evaluation, but rather Dr. Leonard ended it.  When asked if it was his position that Dr. Leonard "misstated the truth," Justin stated:

> Well, I don't know if he's misstated the truth.  He's misstated his impression of the truth.  Maybe he got the impression - - I'm not calling the man a liar, but I didn't, you know, the sheriff's deputy transported me up there.  We sat down at a table.  [Dr. Leonard] said this is going to take three hours.  I said that's fine.  An hour later, he said well, that's all I have.  I said well, okay.  Are you sure?  That's right.  Thank you.

¶24.   Justin also admitted that even though the chancery court had ordered that Dr. Leonard evaluate Justin, Collette, and their son, Justin wrote Dr. Leonard a letter saying he did not want Dr. Leonard to counsel his son.  Justin told the court that he wrote the letter because he believed "there was no need for it."  And as a custodial parent, he "was under the impression" that Dr. Leonard had to have his permission to evaluate his son.

¶25.   The chancery court found that Justin failed to demonstrate that he was without the

8

ability to pay his child support arrearage and denied Justin's motion for release. The chancery court advised Justin against proceeding further without assistance of counsel and provided Justin the names of legal organizations that might provide him assistance if he qualified. The court also advised Justin that this was a final order from which Justin could appeal, and the court entered a written order following the hearing.

¶26.    Justin did not appeal from this order. He did obtain new counsel (his fourth in the case), who appeared with Justin at a status hearing in June 2020. The chancery court explained at the hearing what was needed for Justin to be released from incarceration. The court told Justin that he would have to pay his child support arrearage or demonstrate to the court his inability to pay it. The court also told Justin that he would have to complete the psychological evaluation as previously ordered by the court. Justin's counsel told the court that Justin requested that the examination be recorded. The chancery court said it had no problem with the evaluation being recorded but declined to mandate it.

¶27.    Afterwards, Justin filed a Notice of Appeal, pro se, with this Court in July 2020. In our December 2020 order, we found that the June 2020 hearing served as a "status conference" in which the chancery court explained to Justin "the means by which he could be released from incarceration." En Banc Order, *McPhail v. McPhail*, No. 2020-M-00739-SCT (Miss Dec. 7, 2020). Because no written order was entered between the June 2020 hearing and Justin's notice-of-appeal filing, we found that there was no appealable judgment. *Id.* We also found that the matter was not an interlocutory appeal because it was untimely

9

under Rule 5(a) of the Mississippi Rules of Appellate Procedure. *Id.*

¶28. But given our concerns regarding Justin's lengthy incarceration, we directed the chancery court to hold a hearing within sixty days of our order. *Id.* We directed the chancery court to (1) make a written determination as to Justin's ability to pay the financial obligations imposed upon him by the chancery court; (2) make a written determination as to the exact requirements necessary for Justin to be released from incarceration; and (3) provide written findings of fact and conclusions of law regarding these two issues sufficient to allow for review should an appeal be filed. *Id.*

¶29. The chancery court held a hearing in January 2021 based on our order. At the start of the hearing, the attorney who had represented Justin at the June 2020 hearing informed the court that Justin no longer wanted his representation. The chancery court cautioned Justin about proceeding pro se and asked Justin if that was what he wanted, and Justin responded affirmatively. The chancery court excused the attorney and then proceeded with the hearing.

¶30. The chancery court went over the history of the case as it related to the prior orders, which Justin had refused to obey. The court again told Justin what he needed to do to be released from incarceration.

¶31. Justin again claimed that he had attended the psychological evaluation, saying, "I did everything he asked me to do until he said it was over and I left." Justin said he was then "transported by back to the jail, with the sheriff's department deputy." And "Dr. Leonard did not say anything to that deputy about me leaving early."

10

¶32. Justin indicated at the hearing that he did not have a problem with a psychological evaluation, but he was concerned that Dr. Leonard would want him "to go back as many times as he c[ould]" in order to charge more money. Justin also requested a court order that the evaluation be recorded.

¶33. The chancery court told Justin,

> I can't tell that medical professional how to do his job. I can tell you this. I can mandate certainly that his evaluation of you would be at one time and one time only during that one day. How long that takes during that one day, I don't know, but it will not go from day to day. It will be that one particular time.

¶34. With regard to the child support arrearage and other costs, Justin told the chancery court he was going to liquidate his interest in the gravel pit owned by two other people and him. Following the hearing, the chancery court entered an order with findings of fact and conclusions of law as directed by this Court specifying what Justin needed to do to purge his contempt.

¶35. Justin thereafter filed a petition with this Court seeking an extension to file a petition for interlocutory appeal. In an August 2021 order, we found that the pleading should be treated as a timely notice of appeal under Rule 4 of the Mississippi Rules of Appellate Procedure, and we found that the chancery court's February 2021 order was an appealable judgment. En Banc Order, *McPhail v. McPhail*, No. 2020-CA-00739-SCT (Miss. Aug. 19, 2021).

¶36. In September 2021, Justin's fifth counsel entered an appearance in the case. Following a number of granted motions for enlargement of time filed with this Court,

11

counsel filed a brief on behalf of Justin in May 2022. Afterwards, counsel filed a motion to withdraw as Justin's counsel because Justin wanted to terminate counsel's representation. This Court granted the motion in June 2022. Order, *McPhail v. McPhail*, No. 2020-CA-00739-SCT (Miss. June 28, 2022).

¶37. In August 2022, Justin filed a motion for extension of time to file a reply brief either pro se or through substitute counsel. This Court granted the motion, giving Justin thirty days to do so. Order, *McPhail v. McPhail*, No. 2020-CA-00739-SCT (Miss. Aug. 3, 2022). No reply brief was filed, and this case was submitted for review.

## DISCUSSION

¶38. The only claim Justin submits on appeal is that the chancery court does not have the authority to order him to submit to a psychological evaluation because it violates his constitutional right to privacy. This claim constitutes a collateral attack on the chancery court's underlying order, which this Court does not allow on an appeal from a judgment of civil contempt. "In a case where the alleged contempt consisted of the failure to comply with the terms of the court order or decree, an inquiry into the merits of the order or decree will not be permitted." *Ladner*, 206 So. 2d at 623 (citing *State ex rel. Mason v. Harper's Ferry Bridge Co.*, 16 W. Va 864 (1879); *Tinnon*, 716 So. 2d at 610 ("A party to a suit and/or his attorney should not be allowed to violate an order and collaterally attack it on appeal after they were sanctioned for the violation."); *Masonite Corp.*, 206 So. 2d at 183 ("If a party could disobey a decree by a court of general jurisdiction, and defend on the ground that in

12

his opinion the decree was erroneous, appellees would be constitutionally free to ignore all of the procedures of the law and respect for judicial process."); *see also* **Ill. Cent. R.R. Co. v. Winters**, 815 So. 2d 1168, 1181 (Miss. 2002) ("a trial court can not tolerate a willful defiance of its orders, even if those orders are later found to be an abuse of discretion"), *overruled on other grounds by* **Cooper Tire & Rubber Co. v. McGill**, 890 So. 2d 859 (Miss. 2004)).

¶39.    *Ladner* explains:

> "He who disobeys the orders of a court of general jurisdiction does so at his peril.  It is no answer that the order or decree was improvidently or erroneously granted, however erroneous or improvident it may be. . . .  If without taking the lawful steps, as by appeal, by seasonable application to have the decree or order vacated or corrected, for which in all just cases there are amply orderly provisions, a party could disobey a decree and upon that disobedience defend on the ground that in his opinion the decree was erroneous it would be as well to do away with courts and allow men with all their differences and diversities of opinion, just and unjust, to take what they could by force."

*Ladner*, 206 So. 2d at 623 (quoting V. A. Griffith, *Mississippi Chancery Practice* § 668 (2d ed. 1950)).  *Ladner* added:

> [O]nly where the order or decree is void, or where there was absolutely no jurisdiction under any circumstances, or where there is no state of facts which make it, or the part charged to have been disobeyed, any other than utterly of no force, that any answer attacking the decree itself is allowed,—it is no defense whatever that the decree is erroneous so long as not void.

*Id.* (quoting V. A. Griffith, *Mississippi Chancery Practice* § 668 (2d ed. 1950)).

¶40.    Thereby, our inquiry into civil contempt challenges is limited to "whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if

it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court."[2] *A.M.L v. J.W.L.*, 98 So. 3d 1001, 1019 (Miss. 2012) (internal quotation marks omitted) (quoting *Ladner*, 206 So. 2d at 623). Other defenses "include 'inability to comply with the court order' and/or 'that the court order was unclear. . . .'" *A.M.L*, 98 So. 3d at 1019 (quoting *Ellis v. Ellis*, 840 So. 2d 806, 811 (Miss. Ct. App. 2003)).[3]

¶41. Although Justin does not assert any such defenses on appeal, we have carefully reviewed the record and the findings in the chancery court's February 2021 written order based on our December 2020 order.

¶42. The record makes clear that this case concerns civil contempt. Justin was found in

---

[2] Other jurisdictions have held that a court need not find that failure to comply with a court was willful or intentional because a party's intent is irrelevant when making a civil contempt determination. *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *Jim Walter Resources v. Int'l Union*, *United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980)).

[3] Justin also filed with this Court what he called an "Appellate's Motion for Leave to Proceed in the Mississippi Supreme Court." In the motion, Justin again claims that the chancery court's order that he submit to a psychological evaluation is unconstitutional. Justin adds that Mississippi's "best interest" policy under Mississippi Code Sections 93-5-23 and -24 (Rev. 2021), and its case law applying that policy is also unconstitutional because it violates the fundamental rights of parents and their children. This too is a collateral attack on the chancery court's underlying order, which is not permitted in a habeas corpus proceeding. *Robbins v. Waldrop*, 162 Miss. 803, 140 So. 230 (1932). Remedy lies by appeal from the judgment of contempt as to "whether or not the order was violated, whether or not it was possible to carry out the order of the court, and if it was possible, whether or not such violation was an intentional and willful refusal to abide by the order of the court." *A.M.L*, 98 So. 3d at 1019; *Robbins*, 140 So. at 231. Justin's "Appellate's Motion for Leave to Proceed in the Mississippi Supreme Court" is therefore denied.

contempt for nonpayment of court ordered child support and refusal to complete a psychological evaluation to its conclusion. Justin was ordered incarcerated until he purged his contempt by completing, "unconditionally" and in "good faith," the psychological evaluation and paying his child-support arrearage or by demonstrating to the court his inability to pay it.

¶43. "Civil contempt orders enforce a private party's rights or compel compliance with a court's order". *Hanshaw v. Hanshaw*, 55 So. 3d 143, 147 (Miss. 2011) (citing *Purvis v. Purvis*, 657 So. 2d 794, 796 (Miss. 1994)). A chancery court is given "wide discretion in 'exerting [its] coercive powers to enforce [its] decrees.'" *Id.* (quoting *Matthews v. Matthews*, 227 Miss. 358, 86 So. 2d 462 (1956)); *see also* Miss. Code Ann. § 9-1-17 (Rev. 2019) (any person that "refuse[s] to obey or perform any rules, order, or judgment of the court, such court shall have power to fine and imprison such . . . person . . . until the rule, order, or judgment shall be complied with").

¶44. Unlike criminal contempt, which typically carries a punitive fixed sentence, a civil contemnor "carries the keys to his prison in his own pocket" through his ability to comply with the court's orders and end his remedial sanction. *Common Cause of Miss. v. Smith*, 548 So. 2d 412, 415 (Miss. 1989) (internal quotation mark omitted) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442, 31 S. Ct. 492, 55 L. Ed. 797 (1911)). "The paradigmatic coercive, civil contempt sanction, as set forth in *Gompers*, involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to

15

pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.'" ***Int'l Union, United Mine Workers of Am. v. Bagwell***, 512 U.S. 821, 828, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (quoting ***Gompers***, 221 U.S. at 442).

¶45. What sanction to impose for civil contempt belongs to the chancery court's sound discretion. *See **Gebetsberger v. East***, 627 So. 2d 823, 826 (Miss. 1993) ("We regard the determination of punishment for contempt—fine, imprisonment, both, or neither—as within the discretion of the chancellor."). This Court will not interfere absent manifest error or abuse of discretion. ***Id.***

¶46. The record before us unmistakably shows that from the beginning of this case, Justin has willfully and purposely defied the chancery court's orders. When ordered to provide the name of a mental health professional to the court and submit to a drug test, Justin did neither because, as he told the court, psychological evaluations are "bullshit," and the "drug testing industry is plagued with bias." At the same time, Justin unilaterally stopped paying his child support.

¶47. The chancery court ordered Justin incarcerated until he complied with the court's orders. The court made it clear to Justin that with regard to child support, Justin could submit any evidence that sufficiently showed "with particularity" his inability to pay his support obligation. ***Hooker***, 205 So. 2d at 278. The court explained to Justin that this would be a defense to his incarceration but not to the contempt. *See **Riser v. Peterson***, 566 So. 2d 210, 212 (Miss. 1990) (emphasis omitted) (emphasizing that when incarcerated for civil contempt

16

for failure to pay a judgment, a person "is always entitled to offer evidence of an inability to pay as defense, not to the contempt, but to the incarceration").

¶48. Ultimately, the chancery court held that its orders that Justin submit to a drug test and provide the name of a mental health professional were moot given Dr. Leonard's appointment and due to Justin's incarceration and the amount of time that had passed. Justin remained incarcerated for not paying his child support and not demonstrating an inability to pay it.

¶49. After being ordered to meet with Dr. Leonard before a certain date, Justin refused to be evaluated unless certain conditions were met. After the next show cause hearing, the chancery court found that Justin willfully disobeyed its order and that Justin remained in contempt for not paying his child support.

¶50. At the next status hearing, Justin agreed to "unconditionally" submit to a psychological evaluation. The chancery court entered a written order that upon Justin's "good faith completion of the evaluation," it would consider any motion for his release from incarceration and any evidence "with the particularity required by law for a determination of inability to pay the child support arrearage and other amounts previously ordered to be paid by him."

¶51. As mentioned, a sheriff's deputy transported Justin to his appointment with Dr. Leonard for the scheduled psychological examination. It ended prematurely. Dr. Leonard stated in his report that Justin "refused to complete psychological testing, stating [Justin]

wanted to end the evaluation." Justin disputed this, claiming that Dr. Leonard had ended it. Justin submitted that he did everything he was required to do by attending the meeting. The chancery court found otherwise, finding in its February 2021 order that Justin "refused to complete the testing."

¶52. Mississippi requires that a party must make "a good faith effort" to comply with a court's order. *Winters*, 815 So. 2d at 1181. A party is "required to obey the order in spirit as well as to obey it literally." *Richardson v. Thomas*, 257 So. 2d 877, 880 (Miss. 1972) (citing *Equitable Life Assurance Soc'y of U.S. v. Gex's Est.*, 184 Miss. 577, 186 So. 659 (1939)).

¶53. Dr. Leonard's report to the chancery court said that Justin "refused to complete psychological testing" and that Justin "stat[ed] he wanted to end the evaluation." This constituted a prima facie showing that Justin failed to comply with the chancery court's orders that he submit to a psychological evaluation in good faith and to completion. The burden shifted to Justin to demonstrate that he was not guilty of willful or deliberate violation of the order. *R.K. v. J.K.*, 946 So. 2d 764, 778 (Miss. 2007).

¶54. Justin failed to do so. He merely claimed that Dr. Leonard ended the evaluation after one hour into what (according to Justin) was supposed to be a three-hour session. The chancery court found that this was Justin's doing. Given Justin's flagrant contumacious conduct prior to meeting with Dr. Leonard, and his testimony afterwards, we find that the record more than supports the chancery court's finding. "Contempt is an issue of fact to be

18

decided on a case-by-case basis." *Id.* at 777 (citing *Mizell v. Mizell*, 708 So. 2d 55, 64 (Miss. 1998)). The "trial court due to its temporal physical proximity to the parties 'is infinitely more competent to decide the matter.'" *Id.* (quoting *Cumberland v. Cumberland*, 564 So. 2d 839, 845 (Miss. 1990)).

¶55. With regard to Justin's contempt for child support, the record shows that he has failed to demonstrate with satisfactory evidence an inability to pay. Justin admitted to owning a valuable asset, which he told the chancery court at the January 2021 hearing he was going to liquidate.

¶56. It has been submitted that Justin has since done so and has satisfied most if not all of his support obligations. As we stated in our April 2022 order, this is for the chancery court's determination. En Banc Order, *McPhail v. McPhail*, No. 2020-CA-00739-SCT (Miss. Apr. 19, 2022). In March 2022, Justin had requested that we allow him to post a bond in order to be released from incarceration pending the outcome of his appeal. *Id.* We denied the request because the chancery court had not had an opportunity to address Justin's request subsequent to his "attempt to purge himself of at least part of his contempt" after paying his court-ordered child support. *Id.* We noted that Justin had been denied release by the chancery court in February 2022, "at a time when [Justin] had indicated an ability to pay support but had still failed to do so." *Id.* We remanded the matter "for an adjudication of Justin's request for release on bond pending appeal in light of his child support payment subsequent to the February 24, 2022 denial of his prior motion." *Id.* We ordered the chancery court, if

it denied bond, to specifically state its reasons for denial and the additional steps necessary for Justin to purge himself of his contempt including "specific directives regarding any psychological examinations required by the court . . . ." *Id.*

¶57. The dissent contends that the chancery court has failed to comply with our April 2022 order. The dissent is incorrect; the record does not show that the chancery court has failed to do anything ordered by this Court.

¶58. The chancery court's docket shows that following this Court's April 2022 order, the chancery court scheduled a hearing for July 2022. The hearing was continued to August 2022 and was continued again to October 2022. An agreed order for continuance was entered in October 2022. The docket shows that Collette filed a motion for contempt in May 2022 and an amended motion for contempt in August 2022. Justin's fifth attorney, who participated in Justin's appeal, withdrew from the case in June 2022. A new attorney entered an appearance for Justin in October 2022, just prior to the agreed order for continuance.

¶59. As to the dissent's other contentions, we address each in turn.

¶60. First, the dissent contends that *Graves v. State*, 66 So. 3d 148 (Miss. 2011), establishes a limitation on the chancellor's contempt power. And based on *Graves*, the chancery court applied the wrong legal standard and has failed to consider whether Justin's continued incarceration will lead to compliance with the chancery court's order.

¶61. *Graves* does not establish any new rule or limitation regarding Mississippi's contempt law. Moreover, the Court in *Graves* dealt with criminal contempt, and it is inapposite to the

case before us.

¶62. In *Graves*, a circuit court judge held a county prosecutor in criminal contempt and sentenced him to two days in jail along with a fine for not being prepared in three separate DUI cases pending before the court and for not providing video evidence to defense counsel in one of the cases as previously ordered by the judge. *Graves*, 66 So. 3d at 150-51. On certiorari review, this Court found that the matter involved alleged constructive (indirect) criminal contempt "for acts that—in whole or in part—occurred outside the presence of the judge." *Id.* at 153. Because the matter involved constructive criminal contemp, rather than civil or direct contempt, another judge should have presided over the contempt proceeding. *Id.*

¶63. The *Graves* Court reiterated the difference between civil contempt and criminal contempt, explaining that "[t]he purpose of civil contempt is to compel compliance with the court's orders, admonitions, and instructions, while the purpose of criminal contempt is to punish." *Id.* at 151 (emphasis omitted). While the matter involved a previous order from the circuit judge, the Court in *Graves* found there was no evidence in the record that the prosecutor had "wilfully and deliberately" ignored the order. *Id.* at 153 (internal quotation marks omitted).

¶64. Our case involves civil contempt in a child-custody modification proceeding. And the record shows with more than sufficient evidence that Justin has willfully defied the chancery court's orders.

21

¶65.    Second, the dissent contends that the chancery court failed to heed the United States Supreme Court's rule that "a court must exercise '[t]he least possible power adequate to the end proposed.' *Anderson v. Dunn*, 6 Wheat. 204, 231, 5 L. Ed. 242 (1821); *In re Michael*, 326 U.S. 224, 227, 66 S. Ct. 78, 79, 90 L. Ed. 30 (1945)." *Spallone v. United States*, 493 U.S. 265, 276, 110 S. Ct. 625, 632, 107 L. Ed. 2d 644 (1990) (alteration in original) (internal quotation mark omitted) (quoting *Shillitani v. United States*, 384 U.S. 364, 371, 86 S. Ct. 1531, 1536, 16 L. Ed. 2d 622 (1966)).  Therefore, we must review the chancery court's order of contempt to determine whether a lesser power was available to the court to achieve the end proposed.  The dissent contends that the "least possible power adequate to the end proposed" here was for the chancery court to give Collette what she asked for—full custody of the minor child.  Diss. Op. ¶114.

¶66.    We reiterate that in Mississippi, what sanction to impose for contempt belongs to the chancery court's sound discretion.  *Gebetsberger*, 627 So. 2d at 826.  Chancery courts are given "wide latitude in the exercise of sound discretion when exerting [their] coercive powers to enforce [their] decrees."  *Matthews*, 86 So. 2d at 462 ("no hard and fast rule can be stated that would apply to the various situations arising in the lower courts in [such] cases[.]").

¶67.    Neither *Spallone* or *Shillitani* is controlling here.  And even if they were, neither case compels what the dissent contends.

¶68.    Both *Spallone* and *Shillitani* were decided under the Supreme Court's supervisory

22

authority over the federal district courts' contempt powers. As the Supreme Court has made clear, "It is beyond dispute that [this Court does] not hold a supervisory power over the [state] courts." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345, 126 S. Ct. 2669, 165 L. Ed. 2d. 557 (2006) (internal quotation marks omitted) (quoting *Dickerson v. United States*, 530 U.S. 428, 438, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000)); *see also* **Smith v. Phillips**, 455 U.S. 209, 221, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.") (citing *Chandler v. Florida*, 449 U.S. 560, 570, 582-83, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981))).

¶69.    The precept that "the least possible power adequate to the end proposed" should be used in contempt cases is based on equitable principle and has been applied by the Supreme Court only in federal cases. *See, e.g.*, **Pounders v. Watson**, 521 U.S. 982, 990, 117 S. Ct. 2359, 2363, 138 L. Ed. 2d 976 (1997) ("in the context of reviewing a federal contempt order, the equitable principle that only 'the least possible power adequate to the end proposed' should be used in contempt cases" (quoting **United States v. Wilson**, 421 U.S. 309, 319, 95 S. Ct. 1802, 44 L. Ed. 2d 186 (1975))). The principle derives from *Anderson* in which the Court held that although "there is no power given by the constitution to [Congress] to punish for contempts, except when committed by their own members[,]" the power is implied by the

"principle of self-preservation[.]"[4]  *Anderson*, 19 U.S. at 225, 230.

¶70.    The Court did not apply or mention this principle in a federal-court contempt case

until *In re Michael*, which was decided over 120 years after *Anderson*.  There, the Court

pointed out that through the Act of 1831, Congress, with "deliberate . . . purpose [drastically]

curtail[ed] the range of conduct which [federal courts] could punish as contempt."  *In re*

*Michael*, 326 U.S. at 227 (citing *Nye v. United States*, 313 U.S. 33, 44-48, 61 S. Ct. 810, 85

L. Ed. 1172 (1941)).  The Court said that "references to that Act's history in the *Nye* case,

supra, reveal a Congressional intent to safeguard constitutional procedures by limiting federal

district courts, as Congress is limited in contempt cases, to 'the least possible power adequate

to the end proposed.'" *Id.* (quoting *Anderson*, 19 U.S. at 231).

¶71.    The *Anderson* principle has been mentioned by the Supreme Court in only a handful

---

[4]    Speaking to what extent this contempt power may be exercised, the Court in *Anderson* said as follows:

> Analogy, and the nature of the case, furnish the answer—'*the least possible power adequate to the end proposed*;' which is the power of imprisonment. It may, at first view, and from the history of the practice of our legislative bodies, be thought to extend to other inflictions. But every other will be found to be mere commutation for confinement; since commitment alone is the alternative where the individual proves contumacious. And even to the *duration* of imprisonment a period is imposed by the nature of things, since the existence of the power that imprisons is indispensable to its continuance; and although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodical dissolution. It follows, that imprisonment must terminate with that adjournment.

*Id.* at 230-31.

of federal contempt cases, and it has done so when speaking to a district court's contempt authority in general. The principle appears to serve more as a cautionary maxim rather than an explicit rule.[5]

¶72.    Regardless, the Supreme Court still recognizes that a "coercive, civil contempt sanction" may involve "confining a contemnor indefinitely until he complies with an affirmative command such as an order . . . ." *Bagwell*, 512 U.S. at 828. The sanction is remedial, not punitive, and "those who are imprisoned until they obey the order, 'carry the keys of their prison in their own pockets.'" *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 633, 108 S. Ct. 1423, 1431, 99 L. Ed. 2d 721 (1988) (quoting *Penfield Co. v. SEC*, 330 U.S. 585, 590, 67 S. Ct. 918, 91 L. Ed. 1117 (1947)); *see also* *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006) (seven-year coercive confinement did not violate petitioner's due process rights); *United States v. Harris*, 582 F.3d 512, 513 (3d Cir. 2009) (same with five-year coercive confinement); *Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002) (reversing habeas court's order releasing a state petitioner from seven-year conditional confinement as there is no federal constitutional bar to petitioner's "indefinite confinement for civil contempt so long as he retains the ability to comply with the order").

---

[5] In *United States v. Armstrong*, 781 F.2d 700, 703 (9th Cir. 1986), the United States Court of Appeals for the Ninth Circuit opined that the *Shillitani* Court's use of the *Anderson* principle (requiring the trial judge to first consider coercive civil contempt measures before resorting to criminal sanctions) was dictum. It "was not intended to serve as a rule to be followed in every case in which criminal contempt sanctions are imposed." *Armstrong*, 781 F.2d at 705 (citing *Harris v. United States*, 382 U.S. 162, 86 S. Ct. 352, 15 L. Ed. 2d 240 (1965)).

¶73. Further, similar to ***Shillitani***'s actual holding,[6] this Court has long recognized that in civil contempt matters, one has to have the ability to comply with a court's order. ***Hamblin v. Hamblin***, 107 Miss. 113, 65 So. 113, 114 (1914) ("To find that defendant was in contempt, it was necessary to find that he was able to obey the decree of the court.").

¶74. Also, as our Court of Appeals has recognized, a court's failure to employ the coercive powers available to it to compel a party into compliance with a court's order can constitute an abuse of discretion. ***Allred v. Allred***, 735 So. 2d 1064, 1070 (Miss. Ct. App. 1999) (remanding with instructions to chancery court to proceed with its contempt power to enforce compliance with its previously imposed court-ordered obligations).

¶75. Again, what sanctions to impose for contempt lies within the chancery court's sound discretion. ***Gebetsberger***, 627 So. 2d at 826 ("We regard the determination of punishment for contempt—fine, imprisonment, both, or neither—as within the discretion of the chancellor."). A chancery court may decide that when a party refuses to submit to a psychological evaluation as ordered, there may be no alternative but to draw a negative inference from that refusal when determining proper custody and visitation rights in a child-custody matter. This is a consequential measure, however, that should not be used summarily. It should be employed as a last resort and with fair warning to the contemnor.

---

[6] ***Shillitani*** held that given the conditional nature of civil-contempt sentences, neither an indictment or a jury trial is constitutionally required. ***Shillitani***, 384 U.S. at 370-71. But "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." ***Id.*** at 371 (citing ***Maggio v. Zeitz***, 333 U.S. 56, 76, 68 S. Ct. 401, 92 L. Ed. 476 (1948)).

The chancery court, of course, also has the authority to use other sanctions to compel compliance, such as restricting visitation rights until the party complies.

¶76. As mentioned, "[n]o hard and fast rule can be stated that would apply to the various situations arising in the lower courts in cases of this kind[.]" *Matthews*, 86 So. 2d at 462. And we will not mandate one here as the dissent would have us.

¶77. Third, the dissent contends that Justin substantially complied with the chancery court's order to undergo a psychological evaluation. The dissent contends that the chancery court based Justin's incarceration primarily on Justin's refusal's to submit to a psychological evaluation and that we make it appear that Justin did not attempt to comply with the order.

¶78. As the chancery court's February 2021 order makes clear, the court found Justin in willful contempt for nonpayment of child support *and* refusal to complete a psychological evaluation to its conclusion. Prior to Justin's meeting with Dr. Leonard, the chancery court twice ordered him to submit in "good faith" to a psychological evaluation by Dr. Leonard. The court specifically instructed that Justin would remain incarcerated until his "good faith completion of the evaluation[.]" Justin willfully refused to complete the psychological testing and violated the court's order.

¶79. That Dr. Leonard reported his observations of Justin and gave a recommendation with regard to visitation is of no moment. Irrespective of either, Justin did not complete the psychological evaluation as ordered by the court. Further, "[w]hile the consultation of experts in various fields is often helpful to the chancellor in reaching an informed decision

27

as to such important and complicated matters as child custody and visitation, the ultimate responsibility for such decisions is the non-delegable duty of the court itself." *Allred*, 735 So. 2d at 1068.

¶80.    Fourth, the dissent contends that Justin's incarceration is not in the best interest of the child, and the chancery court failed to consider the legal principles in *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

¶81.    Justin's incarceration is in no one's best interest.  But as the record makes unmistakably clear, it was Justin who willfully put himself there.

¶82.    Long ago, this Court explained the importance and necessity behind a court's contempt powers:

> The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.  It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law.  A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it. In this country, all courts derive their authority from the people, and hold it in trust for their security and benefit.  In this State, all judges are elected by the people, and hold their authority, in a double sense, directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents.  It is the authority and laws emanating from the people, which the judges sit to exercise and enforce.  Contempts against these courts, in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law, whom they employ in the conduct of their government.  The power to compel the lawless offender, against decency and propriety, to respect the laws of his country, and submit to their authority (a duty to which the good citizen yields hearty obedience, without compulsion) must exist, or courts and laws operate at last as a *restraint*

28

upon the upright, who need no restraint, and a license to the offenders, whom they are made to subdue.

*Watson v. Williams*, 36 Miss. 331, 341-42 (1858); *see also* *United States v. Barnett*, 376 U.S. 681, 695, 84 S. Ct. 984, 992, 12 L. Ed. 2d 23 (1964) (referring to *Watson* as a "celebrated case that has been cited with approval in many state jurisdictions as well as in cases of this Court").

¶83.    The custody-modification proceeding to adjudicate the *Albright* factors has not begun due to Justin's contumacious conduct.  And *Albright* is not controlling in our review as to whether Justin willfully violated the chancery court's orders.

¶84.    Fifth, the dissent contends that the cost of this contempt litigation violates Rule 1 of the Mississippi Rules of Civil Procedure that says "[t]hese rules shall be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action."  For the reasons articulated in *Watson*, we will not sacrifice the necessity of a court's contempt authority on the altar of expediency.  A court that does not enforce compliance with its orders will cease to be a court capable of carrying out the objective of Rule 1.

¶85.    Sixth, the dissent contends that Justin is not in contempt for nonpayment of child support.  Again, the chancery court's February 2021 contempt order is the only ruling properly before us.  While it has been submitted that Justin has satisfied his child support arrearage, all we can consider at this point is the chancery court's February 2021 order finding him in continuing contempt for failing to pay his child-support arrearage.

29

¶86.    As mentioned, Justin admitted to the arrearage and to owning a valuable asset that he told the chancery court he was going to liquidate. The chancery court ruled that Justin had yet to show with particularity an inability to pay the arrearage. The chancery court told the parties it would approve any financial arrangement that the parties agreed upon.

¶87.    All that Mississippi law requires in a contempt action involving unpaid child support is a prima facie showing by the party entitled to receive child support that the party required to pay the support has failed to do so. *R.K.*, 946 So. 2d at 777-78. The burden then shifts to the party who failed to pay to show an applicable defense with "clear and convincing" proof. *Id.* at 778 (citing *Lahmann v. Hallmog*, 722 So. 2d 614, 620 (Miss. 1998)).

¶88.    Collette demonstrated a prima facie showing that Justin had not paid his child support. The burden shifted to Justin either to satisfy the arrearage with payment or to demonstrate to the court with particularity his inability to pay it. He failed to do either prior to the February 2021 order. Collette had no burden or responsibility to demonstrate that she had "undertak[en] reasonable collection efforts to satisfy" Justin's child-support responsibilities. Diss. Op. ¶141.

¶89.    Lastly, in extremely rare instances, this Court has offered suggestions in contempt matters. In *Paxton v. Paxton*, 222 So. 2d 834, 835 (Miss. 1969), an ex-wife was required to deliver certain property (which included possession of the marital home) to her ex-husband by a certain date "in good order and repair and substantially in the same condition as it was at the date of the decree." Before delivering the property, the ex-wife caused extensive

damage to the home. *Id.* The chancery court held the ex-wife in civil contempt and ordered her jailed until she complied with the decree by restoring the home to substantially the same condition as it was before. *Id.* at 835-36.

¶90.    On appeal, this Court found that the chancery court erred in part with its contempt order by not fixing an amount of damage that the ex-wife could pay to purge herself of contempt. *Id.* at 837. But without deciding whether the ex-wife was guilty of contempt, this Court reversed for a new hearing based on documented information presented on appeal that the ex-wife had since been committed to the state hospital and diagnosed with schizophrenia. *Id.* Also, a plea for mitigation of punishment had been filed on appeal, which this Court said it could consider given that this Court is required by statute to consider "whether appellant was guilty of contempt." *Id.* The *Paxton* Court said:

> We do not believe that anyone would seriously contend that if appellant was insane at the time she failed and refused to abide by the decree of the court, she could be guilty of contempt of court. Furthermore, if she is presently insane, she should not be committed to jail. Although this defense was not raised in the trial of this case, a review of the testimony convinces us that there were reasonable grounds for one to suspect that appellant was not a sane person. In view of these circumstances the least we could do before affirming the decree would be to direct that the chancellor conduct a hearing to determine whether appellant was insane at the time she was adjudged in contempt of court.

*Id.*

¶91.    On remand, the chancery court found as fact that the ex-wife was sane at the time she refused to abide by the decree, and the court entered a fixed amount of damages she could pay to purge herself of contempt. *Paxton v. Paxton*, 305 So. 2d 106, 107 (Miss. 1974). The

31

chancellor also concluded, "as suggested in our former opinion, that [appellant] should not be jailed for failure to purge herself of contempt by paying the sum mentioned, unless and until she should have been restored to sanity." *Id.* This Court affirmed the contempt order, finding that the chancery court was not "manifestly wrong." *Id.*

¶92. The circumstances found in *Paxton* are not present here. Nowhere does the record indicate or even suggest that Justin is insane. Rather, it shows a calculating individual that has demonstrated extreme recalcitrant behavior and continuous contempt for the chancery court's orders and its authority in general.

¶93. Starting with the chancery court's first order, Justin sought to test the court's authority and its tolerance. As his numerous pro se filings in the chancery court show, after failing to comply with the court's orders, Justin then attempted to excuse his failures either by arguing loopholes he thinks exist in the order or by interpreting the order in a way that allowed him to defy it. Indeed, in one of his filings, Justin submitted that it is somehow unconstitutional for the chancery court now to employ a negative inference concerning his failure to take a drug test.

¶94. Also in his filings, Justin appeared to submit that his convictions with regard to psychological evaluations are such that he will not participate no matter the consequence. But he strung the court along by then indicating in open court that he was willing to participate in an evaluation. And undoubtedly, Justin is now awaiting an answer from this Court on his right-to-privacy claim before he makes his next decision. For the

aforementioned reasons, we do not address his claim. Again, the only question properly before us is the chancery court's February 2021 contempt order, which we affirm.

¶95. But, while we fully disagree with the dissent's view of the case and its take on the law that governs, we too are greatly concerned with Justin's continued incarceration. Not so for Justin. He, and he alone, put himself there, and he has the ability to release himself at any time. Our concern is with the son.

¶96. The reason for the court-ordered psychological evaluation was because both parties had put the other's mental health at issue by their respective pleadings in the custody-modification matter. Also, information had been provided to the court about certain troubling behaviors. So there was certainly a basis for the court to order a psychological evaluation for the family. As this Court has said, a parent's "psychological makeup, as a potential detriment to the children, [is] certainly a valid factor to consider when awarding permanent custody." *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995) (citing *Albright*, 437 So. 2d at 1005); *see also Newsom v. Newsom*, 557 So. 2d 511, 517 (Miss. 1990) (holding apparent instability as factor in changing child custody).

¶97. As the dissent indicates, however, the son is fast approaching the minimum age of majority, and the contempt order will soon lose its remedial purpose. Therefore, the chancery court might want to consider one of the alternatives mentioned above or any other measure that the court finds, "in good conscience and as equity [may] dictate[,]" necessary in this case. *Sappington v. Sappington*, 245 Miss. 260, 147 So. 2d 494, 499 (1962) (in which this

33

Court made a similar request in a contempt matter). "Justice is always tempered with mercy[,]" and it might benefit the son greatly to see it wielded on his behalf. *Id.* at 497.

## CONCLUSION

¶98.  We affirm the chancery court's February 2021 order, and we remand the case for further proceedings.

¶99.  **AFFIRMED AND REMANDED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR.  GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ., AND ISHEE, J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶100.  Justin McPhail has been in jail for 1,763 days, almost five years,[7] on a charge of civil contempt.  The chancellor committed reversible error, and Justin should be immediately released.

*A.      Mississippi law requires Justin's release.*

¶101.  When they divorced in 2010, Muffet[8] and Justin agreed to share joint legal and physical custody of their child, B.M.  B.M. was born on December 29, 2005, and is now seventeen years old.[9]  Even though Justin is at present entitled to joint custody of B.M., B.M. and his father have not been able to share visitation or custody for almost five years now. In

---

[7] Calculated through January 31, 2023.

[8] The record reflects that Collette was also known as "Muffet."

[9] In a practical sense, this custody fight is now meaningless and an exercise in futility because B.M. is nearing the age of majority.

34

fact, Justin has been incarcerated for almost one-quarter of B.M.'s life, and his incarceration continues with no end in sight.

¶102. Muffet began this litigation merely three years after their agreed divorce. In 2013, she filed a motion to modify child custody and for citation for contempt. She asked for full custody and for Justin to be held in contempt for nonpayment of child support.[10] From 2013 through 2017, Muffet filed three more petitions that asked for modification and contempt. Not one petition was successful. The matter now before the Court is based on Muffet's fourth petition to modify custody. But no modification hearing has been held.

¶103. In my review of the record, I find no hearing at which Muffet offered sufficient evidence to prove a material change of circumstances or in which the *Albright*[11] factors or B.M.'s best interests were considered by the chancellor. If Muffet had, the chancellor could have simply modified custody, and incarceration would have been unnecessary.

¶104. In *Graves v. State*, 66 So. 3d 148, 152 (Miss. 2011) (emphasis added) (footnotes omitted) (citations omitted), this Court ruled:

> Although most contempt is either civil or criminal, a single act — or failure to act — could lead to both civil and criminal contempt. For instance, an attorney refusing to comply with a court's order to produce a particular document *could be held in contempt and incarcerated* until the document is produced, *or until it becomes clear that incarceration will not lead to compliance with the order*. This would be civil contempt.
>
> But there are many reasons why the attorney may have failed to produce

---

[10] Muffet claimed Justin was four months behind on child support ($1,400).

[11] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

the document. Where the reason is frivolous or disrespectful, the judge may also hold the attorney in criminal contempt and order punishment of a fine, incarceration for a specific time, or both. The judge may determine that criminal contempt is inappropriate where the attorney's refusal to produce the document was not unreasonable or disrespectful—for instance, where the attorney had a good-faith belief that the document was privileged.

*Id.*

¶105. The Court in *Graves* established the limitation on the chancellor's contempt power. *Id.* Under *Graves*, Justin's incarceration may not continue once "it becomes clear that incarceration will not lead to compliance with the order." *Id.* There can be no doubt, now almost five years later, that Justin's incarceration will not lead to his compliance with the order. Based on *Graves*, the chancellor's order should be reversed because he applied the wrong legal standard and has failed to consider whether Justin's continued incarceration will lead to compliance with the order. *Id.* The continued incarceration of Justin appears to be turning punitive, motivated at least in part by a desire to punish Justin's past noncompliance rather than a clear belief that it will secure his future compliance. Justin should be released immediately, and the modification claim should be remanded to the chancery court.

¶106. Upon Justin's release, the chancery court may finally hold a hearing and require Muffet to present evidence to prove "that a material change of circumstances has occurred . . . since the [divorce], that the change adversely affects the child, and that modification is in the child's best interests, as determined by application of the *Albright* factors." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.11[5][a] (3rd ed. 2020) (citing *Butler v. Mozingo*, 287 So. 3d 980 (Miss. Ct. App. 2019); *Bolton v. Bolton*, 63 So. 3d 600 (Miss. Ct.

36

App. 2011)).[12] Despite the lack of evidence or a hearing for almost ten years now, Muffet has in fact obtained the very relief she sought, i.e., full custody of B.M. while Justin remains incarcerated.

¶107. In *Graves*, this Court recognized that no person should remain in jail for five years on civil contempt. *Graves*, 66 So. 3d at 152. The contempt and the person's incarceration should end when "it becomes clear that incarceration will not lead to compliance with the order." *Id.* The tragic irony here is that Justin, who supposedly holds the key to unlock the jail house door if only he fully submits to a psychological assessment, remains incarcerated because he has not used that key for almost five years now.[13]

> B.     The United States Supreme Court's legal standard for contempt
> requires Justin's immediate release from custody.

¶108. The chancellor could have modified custody years ago based on the fact that Justin failed to submit to the ordered psychological assessment or drug testing. The United States Supreme Court, in *Spallone v. United States*, 493 U.S. 265, 276, 110 S. Ct. 625, 107 L. Ed. 2d 644 (1990) (alteration in original) (emphasis added) (citations omitted), ruled:

> In selecting a means to enforce the consent judgment, the District Court was
> entitled to rely on the axiom that "courts have inherent power to enforce

---

[12] *But see* Miss. Code Ann. § 93-5-24(6) (Rev. 2021) (Modification motions may be granted, when the parties have joint custody, "upon the petition of one (1) parent showing that a material change in circumstances has occurred.")

[13] The irony is further enhanced by the fact that the state of Mississippi is currently under federal court supervision because "Mississippi's current mental health system . . . falls short of the requirements established by law." *United States v. Mississippi*, 400 F. Supp. 3d 546, 549 (S.D. Miss. 2019).

compliance with their lawful orders through civil contempt." When a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers. But while "remedial powers of an equity court must be adequate to the task, . . . they are not unlimited." "[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." And *the use of the contempt power places an additional limitation on a district court's discretion*, for as the Court of Appeals recognized, "*in selecting contempt sanctions, **a court is obliged to use the 'least possible power adequate to the end proposed.'***"

The Court also ruled that "[t]his limitation accords with the doctrine *that a court must exercise '[t]he least possible power adequate to the end proposed.'*" ***Shillitani v. United States***, 384 U.S. 364, 371, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966) (second alteration in original) (emphasis added) (quoting ***Anderson v. Dunn***, 19 U.S. 204, 231, 5 L. Ed. 242 (1821); ***In re Michael***, 326 U.S. 224, 227, 66 S. Ct. 78, 90 L. Ed. 30 (1945)).

¶109. The chancellor had several tools in his toolbox to deal with Justin's contempt. The United States Supreme Court made it clear that, "in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'" ***Spallone***, 493 U.S. at 276 (internal quotation marks omitted) (quoting ***United States v. Yonkers***, 856 F.2d 444, 454 (2nd Cir. 1988), *reversed on other grounds by **Spallone***, 493 U.S. at 273). Therefore, this Court must review the chancellor's order of contempt to determine whether the chancellor exercised the least possible power to achieve the end proposed.

¶110. This review begins with Muffet's motion:

[Muffet] requests that given [Justin]'s willful and contumacious contempt of this Court, that the current visitation schedule be amended as determined by the Court *to establish physical custody with the mother subject to such terms*

38

*as the Court finds in the best interests of the child pending psychological assessment by a Court designated psychologist* or psychiatrist and the Defendant having fully purged himself from all contempt and established full compliance with the Orders of this Court.

(Emphasis added.) Muffet asked the Court "to establish physical custody" with her until Justin purged the contempt and was in compliance with the court's order. The motion then asked for the following relief:

(C) Unless [Justin] immediately purge himself of contempt of Court, then the Court should order [Justin] to forthwith be incarcerated until he has fully and finally purged himself of his contempt of this Court, and done all things ordered to be done by the Court in this matter . . . .

(D) That the Court *amend the current visitation schedule as determined by the Court to establish physical custody with the mother subject to such terms as the Court finds in the best interests of the child pending psychological assessment* by a Court designated psychologist or psychiatrist and [Justin] having fully purged himself from all contempt and established full compliance with the Orders of this Court.

(Emphasis added.)

¶111. The chancellor ruled:

The Court finds that [Muffet] has fully complied with the prior orders of the Court in submitting to the required drug test and presenting names of psychologists in accordance with prior Orders of the Court. The Court finds by clear and convincing evidence including his own testimony that the Defendant, Justin McPhail, has not complied with either the required drug test or the submission of names of potential psychologists for appointment by the Court. The Court finds by clear and convincing evidence and the testimony of [Justin] himself, that his refusal to comply with the Orders of this Court is wilful, intentional, and contemptuous. Further, the *Court will draw a rebuttable negative inference at the trial of this matter that had [Justin] submitted to drug testing as ordered the results would not be favorable to him*.

. . . .

IT IS THEREFORE, ORDERED, ADJUDGED, AND DECREED that Justin McPhail shall be held in the Grenada County Jail until such time as he has completely purged himself of contempt of all prior Orders of this Court *including submission to the drug testing previously ordered*, the submission of a proposed psychologist or psychiatrist to the Court, and payment of child support of $1400.

*Pending the Defendant purging himself of contempt,* **the minor child of the parties shall be in the sole physical custody of his mother***, [Muffet]*.

(Emphasis added.) Thus, the chancellor's order declared that Justin's failure to submit to drug testing would be both a rebuttable negative inference at trial and a reason for incarceration.

¶112. A rebuttable negative inference is explained as follows:

When evidence is lost or destroyed by one party (the "spoliator"), *thus hindering the other party's ability to prove his case, a presumption is raised that the missing evidence would have been unfavorable to the party* responsible for its loss. According to Wigmore:

[S]poliation and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates indefinitely though strongly against the whole mass of alleged facts constituting his cause.

2 J. *Wigmore*, Evidence § 278, at 133 (J. Chadbourn rev. 1979). Because the presumption of unfavorability is not solely confined to the specific issue of what information was contained in the missing evidence, the fact finder is free to draw a general negative inference from the act of spoliation, regardless of what the spoliator's rebuttal evidence shows.

*Thomas v. Isle of Capri Casino*, 781 So. 2d 125, 133 (Miss. 2001) (emphasis added).

¶113. Having found a rebuttable negative inference for drug testing, the chancellor also

40

could have easily ruled the same with Justin's refusal to fully submit to a psychological assessment. Likewise, based on a rebuttable negative inference that Justin experienced mental health issues, with no other evidence offered, the chancellor could find that Justin's mental health issues were the basis for a material change of circumstances, that it adversely affected B.M., and that it would establish one or more of the *Albright* factors.

¶114. The legal effect of the chancellor's *announced* decision to draw a rebuttable negative inference is important.  It allowed the chancellor to rely on this inference as evidence in his modification analysis. Based on this rebuttable negative inference, with no other evidence offered, the chancellor could find that Justin's drug use was the basis for a material change of circumstances, it adversely affected B.M., and it would establish one or more of the *Albright* factors.[14]  Certainly, the chancellor's decision to use Justin's failure to submit to drug testing as a rebuttable negative inference would be the least possible power adequate to the end proposed, i.e., Muffet's getting full custody.

¶115. Thus, the chancellor recognized that there was a lesser power available to give Muffet the remedy she requested.  The chancellor could have easily found that the rebuttable

---

[14] For example, in *Barbaro v. Smith*, 282 So. 3d 578, 598-600 (Miss. Ct. App. 2019), the Court of Appeals affirmed the chancellor's consideration of the falsification of a drug test and involvement in a scheme to plant drugs to support a modification of child custody. The court found that the chancellor was correct to use the "drug use" against a party in the consideration of the following *Albright* factors: parenting skills, physical and mental health of the parties, moral fitness of the parents, and best interests of the child.  *Id.*  Based on this rebuttable negative inference for drug use, the chancellor could have granted Muffet's request for modification of child custody and given her sole physical custody.

negative inferences based on Justin's drug use and mental health issues, with no other evidence offered, were sufficient to modify custody and give full legal and physical custody to Muffet. Indeed, that is the practical effect of what has happened. Muffet has had full custody of B.M. for the last five years without even having to submit evidence to support the modification claim.

¶116. The chancellor's "least possible power adequate to the end proposed" was simply to give Muffet what she asked for—full custody of B.M. *Shillitani*, 384 U.S. at 371 (quoting (quoting *Anderson*, 19 U.S. at 231; *In re Michael*, 326 U.S. at 227). Having done so, there was no reason or justification for the chancellor to incarcerate Justin for his failure to submit to psychological testing or drug testing.

¶117. Frankly, no person should be in jail for five years for civil contempt. It is indefensible, in my opinion, for a chancellor to incarcerate a person for five years for civil contempt. If this were a criminal case and Justin were charged with violent crimes like murder, manslaughter, aggravated assault, armed robbery, Mississippi law would require that he be given an opportunity for bail. Justin has been denied basic constitutional protections.

¶118. In fact, the chancellor failed to comply with this Court's April 2022 order that stated that if Justin's request for bond is denied the chancery court

> shall specifically state in a written order (a) the reasons for denial (b) the additional steps necessary for Justin to purge himself of his contempt including, but not limited to, specific directives regarding any psychological examinations required by the court as well as a procedure for Justin to be transported to said examinations should he agree to attend and (c) such other matters as the trial court deems necessary to be considered by this Court.

En Banc Order, ***McPhail v. McPhail***, No. 2020-CA-00739-SCT, at \*2 (Miss. Apr. 19, 2022).

¶119. The majority indicates that Justin's incarceration shall continue for an unlimited period of time. This creates a chilling precedent that would allow judges to sentence noncriminal parties to potential life sentences of incarceration with no form of limitation, trial, or oversight. Based on the majority's decision today, Justin may still be in jail ten years from now, when B.M. is twenty-seven years old, for simply refusing to undergo psychological testing.

¶120. I find that the chancellor's decision should be reversed, that Justin should be released immediately, and that the modification claim should be remanded to the chancery court for an evidentiary hearing on Muffet's modification claim.

    C.    *Justin substantially complied with the chancellor's order to undergo psychological testing.*

¶121. The majority and the chancellor based Justin's incarceration primarily on the finding that Justin refused to submit to psychological testing. The majority makes it appear that Justin did not even attempt to comply with the psychological testing order. This is not true.

¶122. Justin submitted to a psychological assessment. On January 8, 2019, Paul S. Leonard, Ph.D., a licensed clinical psychologist, submitted a report of "Psychological Evaluation" to the chancellor. This nine-page, single-spaced report was extensive. It clearly indicated that Dr. Leonard had significant and substantial exposure to Justin. Although the chancellor and the majority ignore this report, there are four important aspects of this report that we must consider.

43

¶123. First, and most important, Dr. Leonard's report does not state that he needs any further evaluation of Justin.[15] The report does not state that Dr. Leonard's findings are incomplete.

¶124. Second, Dr. Leonard made a specific finding about Justin's mental health. The report stated that Justin "meets the diagnostic criteria for Delusional Disorder; Persecutory Type; Continuous . . . He is unlikely to agree to mental health treatment, nor is he likely to benefit substantially. His prognosis for improvement is poor."

¶125. Third, Dr. Leonard did not recommend Justin be denied custody or visitation. Instead, Dr. Leonard stated, "I recommend that [B.M.] have supervised visitation only with Mr. McPhail for at least six months after Mr. McPhail's release from jail. . . . If Mr. McPhail complies with supervised visitation, I recommend that unsupervised visitation be implemented." Nowhere in the report does it state that Justin should not have visitation with B.M.

¶126. Fourth, Dr. Leonard's report would be sufficient evidence for the chancellor to establish that a material change of circumstances had occurred since the divorce, that the change adversely affected the child, and that modification was in the child's best interests, as determined by an application of the *Albright* factors.

---

[15] Also, the chancellor's order is vague and ambiguous. Neither Muffet, the GAL, nor the chancellor ever specified exactly what tests or measures the psychologist or psychiatrist was to use in this assessment of Justin. The PsychCentral.com website identifies nine different types of psychological tests and eighteen tests and measures. https://psychcentral.com/lib/types-of-psychological-testing#types-of-tests (last visited Dec. 12, 2022).

¶127. The majority does not discuss or examine Dr. Leonard's report. The report noted that Dr. Leonard examined Muffet and that Muffet's mental status exam was normal. The report further noted that the reason for her evaluation was that "she is in a custody situation with her ex-spouse, Justin McPhail. Visitation is not working due to poor communication. She is trying to get full custody of their child . . . [and] The original Permanent Parenting Plan (PPP) recommended joint custody." According to Dr. Leonard's report, Muffet made the following "Allegations about Mr. McPhail":

1.    He has two paranoid schizophrenic family members.

2.    He is showing paranoia, and he has called the chief of Grenada police about his paranoid beliefs.

3.    He got [B.M.] to search the attic while carrying a gun.

4.    He showed [B.M.] what path to take to leave the school in case of a shooting incident.

5.    He contacted the school principal and accused Ms. McPhail of hacking the school computer.

6.    He has had negative people living at his home while [B.M.] is there.

7.    He may be using illicit drugs.

8.    He refused to comply with a court order for drug testing.

9.    He treats women in a disrespectful manner, now [B.M.] does the same and he received an in-school-suspension for insubordination toward his teachers, and [B.M.] has used profanity in describing the judge in this case.

10.    He refused to transport [B.M.] to extra-curricular activities.

11. He did not file income tax returns from 2006-09, and now there are tax liens on her home.

¶128. Dr. Leonard then offered the following detail about his examination of Justin:

Mental Status Exam . . . .

Justin McPhail is a 44y/o Caucasian male. He arrived early in handcuffs and shackles, transported by law enforcement. He did not wear glasses and wrote with his right hand. His hygiene was fair. He was dressed in prison attire. Physical activity was restless. Physical restrictions were not noticed. He was alert and oriented X4. 100% of speech was understood. Speech was primarily spontaneous, rate was moderate, and volume was moderate. Receptive language was good. I did need to frequently redirect him due to accusatory statements blaming others. Comprehension was good. Expressive language was good. Diction was fair. Thought processes were goal-directed. No evidence of hallucinations was reported or observed. Persecutory delusions were evident. Facial expression was restricted and appropriate. Affect was restricted. Mood was irritable. He did not cry or laugh or smile during the interview. Eye contact was good. He interacted in an opinionated and self-righteous maimer. He was able to focus on my questions when asked to do so. Memory functions were intact. Judgment was poor. Insight was poor, Concentration was fair. Cooperation was poor. Intellectual functioning is estimated in the high average range. Estimated reliability of his report is poor, since he was an imprecise historian and informant, he was intentionally evasive often, and he did exaggerate his virtues and minimize his responsibility and problems.

Presenting Issues (the following information was gathered from Mr. McPhail's statements, recollections, and opinions as expressed to me during interviews)

Beginning in May 2018, Mr. McPhail initially refused to consent to the present evaluation despite my offering appointment times at my office, and he also refused me evaluating him at the jail where he was held. On 05/21/18 I received a handwritten letter from Mr. McPhail advising me that he did not consent to me evaluating his son [B.M]. He eventually consented to his own evaluation, and he was transported to my office by law enforcement on 11/12/18. On that date he told me he refused to be evaluated in May 2018 because his recording the evaluation would not be permitted. On 11/12/18 Mr. McPhail signed documents that he understood and agreed to be evaluated.

46

When asked about the reason for his evaluation, Mr. McPhail stated he believed that the Guardian Ad Litem (GAL) Ginger Miller was out to get him. He denied any history of prior mental problems, but instead insisted that Ms. Miller and Attorney Mr. Gore are trying to create evidence of mental illness. He was aware Ms. McPhail and her parents are trying to change the present joint legal and physical custody of [B.M.] he shares with Ms. McPhail. He last had face-to-face contact with [B.M.] eight months ago. Mr. McPhail believes that the GAL has not been honest with him, and that she mispresented the facts about his neglect of [B.M.]. He admitted that a dwelling (his office) where he and [B.M.] stayed had no shower, but he argued that he only brought [B.M.] there to stay ten times over the course of two years.

Mr. McPhail initially denied any prior treatment for a mental illness, but upon further questioning he admitted that he was eventually prescribed Adderall from Dr. Lee (medical doctor) in Grenada, MS with poor results. He admitted that prior to meeting with Dr. Lee, he took an Adderall, liked the way it made him feel, and then he sought out the diagnosis and medication from Dr. Lee. He also admitted to having 3-4 sessions of marital therapy with Dr. Fleming (psychologist). Regarding his present legal situation, he claimed he had no problems with complying with a urine drug screen, but since his request to re-open discovery was ignored, he then refused the hair follicle drug screen. He initially denied any prior history of illicit drug use, but upon further questioning he admitted to prior illicit drug use.

Mr. McPhail initially stated that he has never had any problems caused by his use of alcohol, but upon further questioning he admitted that he had an auto accident at 18 y/o when drinking alcohol and he fell asleep. He claimed he first used marijuana at 20 y/o, he was unsure when he last used it, and he denied his use of marijuana has ever caused him problems. He last used cocaine in his 30's [sic]. He admitted to using LSD in his 20's [sic]. He denied any prior use of Opioids.

Mr. McPhail admitted to having a romantic relationship currently with . . . for the past 3-4 years. He also admitted to allowing [S.C.] to reside in his home along with [S.C.]'s paramour, and he admitted that [S.C.] had drinking problems.

Regarding his instructions to [B.M.] about a shooter at his school, he admitted to telling [B.M.] to use his judgment about whether to listen to Mr. McPhail's instructions or listen to his teachers' instructions.

Regarding whom [B.M.] stays with when visiting Mr. McPhail, he initially stated that [B.M.] spent every night with Mr. McPhail. When I confronted him with [B.M.]'s statement to me that he spends 3-4 nights with his paternal grandmother, Mr. McPhail changed his statement and agreed with [B.M.], and he then became argumentative.

He was able to describe [B.M.], his hobbies, and his interests. He believes that [B.M.] has some repressed feelings about his parent's divorce. When I asked how Mr. McPhail could be a better father, he became very argumentative while stating that he could spend more time with [B.M.] but he didn't have a choice about going to jail.

When asked what he would do differently about his present situation, he stated (while they were married) he would have taken Ms. McPhail and moved somewhere else away from her parents and friends.

When asked what he had done that had made his present situation worse, he stated he had not signed away custody of [B.M.].

Relevant History (the following information was gathered from Mr. McPhail's statements, recollections, and opinions as expressed to me during interviews).

Mr. McPhail was born and raised in MS & KY. His parents divorced when he was 3-4 y/o. His mother soon remarried and he had a good relationship with his stepfather. He has one step-sibling and one half-sibling. His father was not involved in his life and he didn't see him much although he wanted to see his father more often. He resented his family for not explaining to him why he could not talk about his father in his mother's presence. He felt loved when young and he had enough friends. He described himself when young as, "outgoing, athletic, outdoorsy." He began working at 12y/o. As a teen he "played football, had a lot of friends." He denied any abuse or trauma history. The highest grade completed was earning a Bachelor's degree from Ole Miss in 1998, and he was never suspended in grades K-12. However, he spontaneously stated that he took a gun to school for show and tell. He has been married once from 24-38 y/o, but the relationship worsened when Ms. McPhail was pregnant with [B.M.]. He has no family history of mental illness, but then he added that he has a great uncle with frequent inpatient mental hospital treatments. He has one child [B.M.], age 12. He admitted to being arrested 2-3 times, first at 18 y/o for having a concealed weapon in his truck, and second at 24 y/o for growing marijuana plants in his backyard. He last

worked eight months ago as a heavy equipment operator. He has no hobbies now. He has no friends. He visits his mother often.

Psychological Testing

Mr. McPhail refused to complete psychological testing, stating he wanted to end the evaluation.

. . . .

Synthesis and Impressions (My comments in this section of the report are based on the information gathered from the present evaluation, as well as my education, training, and experience)

1.  Ms. McPhail showed good cooperation with the present evaluation. Based upon information gathered for the present evaluation, she showed no signs or symptoms of mental illness or psychopathology.

2.  [B.M.'s] cooperation with the present evaluation was fair-poor. He was guarded and defensive in interviews and in his test-taking approach. Based upon information gathered for the present evaluation, [B.M.] does not show serious signs or symptoms of mental illness or psychopathology. However, he does meet diagnostic criteria for Adjustment Disorder, with mixed disturbance of emotions and conduct, which is a mild disturbance in emotions and behavior due to a stressful event in his life. Based upon report card grades dated 10/25/18, [B.M.] earned A's [sic] in all seven of his school subjects, and he had two excused absences. Based upon records horn [B.M.]'s therapist. [B.M.] has attended therapy from 07/28/18 to 01/05/19, for a total of seven sessions. [B.M.] informed his therapist that he is corresponding with Mr. McPhail via written letters. [B.M.] has successfully learned and demonstrated coping skills taught in therapy. However, [B.M.] believes that when his father is released from jail [B.M.] will no longer be obligated to attend therapy. Therefore, I recommend that [B.M.] be required to participate in therapy at least twice monthly for at least six months after the release of this report.

3.  Justin McPhail showed very poor cooperation prior to the present evaluation, delaying to agreed [sic] to be evaluated for six months. After he agreed to be evaluated and during the evaluation, he refused

49

to complete psychological testing, he was intentionally evasive often, and he did exaggerate his virtues and minimize his responsibility and problems. When confronted about his statements or questioned, further, he either altered his statements, denied any personal responsibility, or more often became argumentative and blamed others.

4. At the end of our interview on 11/12/18, Mr. McPhail asked me to read back all of my transcribed comments. After reading some of my transcribed comments, he stated that I had transcribed his comments accurately. Then, I offered an alternative explanation about an event where Mr. McPhail chose to believe someone was acting against him, which I typically do to assess whether an examinee is able to accept a point of view different from their own. Instead, he then abruptly stated he wanted to end the interview, making statements about my collusion with others regarding how he is being treated. Despite my attempts to sustain the interview, Mr. McPhail refused to answer more questions and clearly stated he would answer no further questions.

5. Mr. McPhail consistently showed a strong tendency to believe that others were acting against him. During our interview, Mr. McPhail accused the following persons as acting against him: myself, the GAL Ms. Miller, Attorney Mr. Gore, Judge Lynchard, Dr. Fleming, Ms. McPhail, and Ms. McPhail's parents.

6. *Mr. McPhail meets the diagnostic criteria for Delusional Disorder; Persecutory Type; Continuous*. Mr. McPhail believes he is being conspired against, by many different persons. He has involved his son [B.M.] in his persecutory delusions (according to [B.M.] and Mr. McPhail), likely causing [B.M.] much confusion and emotional upset. *Mr. McPhail's judgment is poor, leading to decisions that impair his functioning in life, as well as causing distress in others in close proximity and to whom his decisions impact*. He has a history of making decisions in opposition of societal institutions, suggesting that he believes he is entitled to act without regard to rules. *He is unlikely to agree to mental health treatment, nor is he likely to benefit substantially. His prognosis for improvement is poor.*

7. Therefore, considering #1-6 above, *I recommend that [B.M.] have supervised visitation only with Mr. McPhail for at least six months after Mr. McPhail's release from jail*. The visitation supervisor should be

someone of appropriate and credible authority (a non-family member) who can closely monitor and redirect Mr. McPhail should he make inappropriate comments to [B.M.]. Video/audio recording of visitation is strongly recommended given Mr. McPhail's history of allegations against authority figures. Inappropriate comments to [B.M.] would include negative comments about Ms. McPhail or her family, and any comments about Mr. McPhail's legal situation, case, or court personnel, which are all unnecessary and inappropriate for [B.M.] to hear. *If Mr. McPhail complies with supervised visitation, I recommend that unsupervised visitation be implemented*.

(Emphasis added.)

¶129. I am not sure what else the chancellor or the majority deems necessary from Dr. Leonard to make a ruling on the modification claim or in his ***Albright*** analysis. Dr. Leonard does not state that his findings are incomplete or that any further information or examination is necessary. In fact, Justin submitted to an extensive and comprehensive psychological test by Dr. Leonard. Dr. Leonard did not state that Justin is at threat to B.M. or his wellbeing. Dr. Leonard's findings about Justin appear to be sufficient evidence for the chancellor to act on the modification claim. Also, Dr. Leonard's report identifies to the chancellor and the majority that Justin in fact may have some mental health issues that may be responsible for his lengthy incarceration for civil contempt. *See supra* n.5.[16] Despite this detailed and lengthy report, the chancellor and the majority have turned a blind eye to Dr. Leonard's mental health findings as it relates to Justin's incarceration.

---

[16] Dr. Leonard found Justin had "*Delusional Disorder; Persecutory Type; Continuous*. Mr. McPhail believes he is being conspired against, by many different persons." (Emphasis added.) Notably, Justin was diagnosed after nearly two years of imprisonment without a criminal conviction or trial.

¶130. Accordingly, I find the chancellor manifestly erred in his determination that Justin had not purged his contempt by substantially complying with the psychological testing.

> D.    *The best interest of the child is paramount in a custody claim. The chancellor's incarceration of Justin is not in the best interest of the child.*

¶131. Every Mississippi custody matter begins with a basic premise. "It is presumed that mothers and fathers are equally entitled to custody of their children." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.01[4][a] (3rd ed. 2020). Mississippi Code Section 93-13-1 (Rev. 2021) (emphasis added) reads:

> The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. *The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor . . .* or any other matter affecting the minor. . . . But if any father or mother be unsuitable to discharge the duties of guardianship, then the court, or chancellor in vacation, may appoint some suitable person, or having appointed the father or mother, may remove him or her if it appear that such person is unsuitable, and appoint a suitable person.

¶132. In *Albright*, this Court "reaffirm[ed] the applicability of section 93-13-1 . . . . [and] reaffirm[ed] the rule that the *polestar consideration in child custody cases is the best interest and welfare of the child*." *Albright*, 437 So. 2d at 1005 (emphasis added). The Court listed the factors to be considered. *Id.* The Court also warned that "[r]elative financial situations [are] not controlling since *the duty to support is independent of the right to custody*." *Id.* (emphasis added).

¶133. Although *Albright* governs custody matters, the majority fails to consider whether the

52

chancellor's order was in the "best interest and welfare of" B.M. *Id.* The majority makes no effort to explain or consider how Justin's incarceration for more than 1,763 days was and is in B.M.'s best interest and welfare. It was not.

¶134. This appeal should be reversed simply on the ground that the chancellor failed to follow the governing legal principles discussed in *Albright*. First, B.M.'s best interest is not served to have had his father jailed for five years and unable to perform his fatherly duties. Second, *Albright* clearly states that Justin's "financial situations [are] not controlling since the duty to support is independent of the right to custody." *Id.* The majority ignores this important compelling legal requirement.

> E.     *The cost of this litigation violates the Mississippi Rules of Civil Procedure.*

¶135. Rule 1 of the Mississippi Rules of Civil Procedure states that "[t]hese rules *shall be construed, administered, and employed by the court* and the *parties to secure the just, speedy, and **inexpensive determination of every action**.*" (Emphasis added.) The Advisory Committee Note added:

> There probably is no provision in these rules more important than this mandate; it reflects the spirit in which the rules were conceived and written and in which they should be interpreted. *The primary purpose of procedural rules is to promote the ends of justice*; these rules reflect the view that this goal can best be accomplished by the establishment of a single form of action . . . thereby uniting the procedures in law and equity *through a simplified procedure that minimizes technicalities* and *places considerable discretion in the trial judge for construing the rules in a manner that will secure their objectives*.

M.R.C.P. 1 advisory comm. n. (emphasis added).

53

¶136. This Court recently ruled it "recogniz[ed] and endors[ed] *a trial judge's duty to control the courtroom, **using reasonable measures to efficiently move matters along**[.]" Donaldson v. Cotton*, 336 So. 3d 1099, 1106 (Miss. 2022) (alterations in original) (emphasis added) (internal quotation marks omitted) (quoting ***In re Blake***, 912 So. 2d 907, 914 (Miss. 2005)). I find the chancellor has failed in his "duty to control the courtroom, using reasonable measures to efficiently move matters along[.]" ***Id.*** (alteration in original) (internal quotation mark omitted) (quoting ***In re Blake***, 912 So. 2d at 914). And he has further failed "to secure the just, speedy, and inexpensive determination of every action." M.R.C.P. 1. The Advisory Committee Note says, "[t]here probably is no provision in these rules more important than this mandate." M.R.C.P. 1 advisory comm. n. Justin's incarceration has prolonged the modification case by years and has incurred massive expenses to both the parties and the public. We must remember that this is a modification of child custody claim.

¶137. The cost of this litigation is staggering. Through February 2022, the chancellor has assessed guardian ad litum fees of $7,376.47, psychological exam costs of $2,250, attorneys' fees of $1,760, past due child support of $18,772.06. That is about a $30,000 cost to the parties. In addition, the taxpayers of Grenada County have incurred the cost of Justin's incarceration at a cost estimated to be approximately $105,000.[17] This litigation, over a

---

[17] According to the Mississippi Department of Corrections' fiscal year 2022 Cost Per Inmate Day, Joint Legislative Committee on Performance Evaluation and Expenditure Review (December 13, 2022), the estimated cost of incarceration per inmate is $59.24 per day. https://www.peer.ms.gov/Reports/reports/rpt679.pdf. 1,763 days x $59.24/day = $104,440.

modification of child custody claim, has cost the parties and Grenada County more than $135,000. I dare say this "secure[s] the just, speedy and inexpensive determination of" this claim. M.R.C.P. 1.

      *F.*     *Justin is not in contempt for nonpayment of child support.*

¶138. As I read it, the majority concludes that the chancellor's finding of nonpayment of child support no longer supports Justin's contempt and incarceration.

¶139. Justin's incarceration for almost five years should suffice to prove his inability to pay child support. Importantly, to this day, Justin has a judgment that grants him full joint legal and physical custody of B.M. He agreed to pay $350 per month in child support. But his incarceration has interfered with his ability to get a job, earn a living, or have a relationship with his son. His incarceration has also deprived him of custody or visitation. Child support should stop or be held in abeyance once the payor is in jail for nonpayment.

¶140. Additionally, as discussed earlier, the chancellor's assessment of guardian ad litum fees of $7,376.47 and psychological exam costs of $2,250 is manifest error and abuse of discretion in light of Justin's lengthy incarceration.

¶141. Finally, when it comes to the nonpayment of child support, the parties and chancellors have several alternatives available. Here, Muffet and her attorney knew that Justin owned a parcel of land. This land was eventually sold while Justin was incarcerated. Justin should not be held in contempt for nonpayment of child support when Muffet could have easily used a judicial remedy to execute on Justin's property to obtain the funds necessary to satisfy their

55

outstanding judgment.  Mississippi Code Section 13-3-111 provides for execution on a judgment debtor's assets to collect a final judgment.  It states, "[t]he clerks of all courts of law or equity . . . shall, at the request and cost of the owner of the judgment or decree or his attorney, issue executions on all judgments and decrees rendered therein . . . ."  Miss. Code Ann. § 13-3-111 (Rev. 2019).  Muffet and her attorney made no effort to execute on Justin's property.  Especially in a domestic matter, the chancellor should require the judgment creditor to undertake reasonable collection efforts to satisfy the judgment through lawful efforts before the judgment creditor asks for the incarceration of the judgment debtor.

*G.    Conclusion*

¶142.   Justin's incarceration may have been justified at one time. It is not justified today. Justin's incarceration for more than 1,763 days, almost five years, should not continue.  He should be released immediately.  I would reverse and render the chancellor's order of contempt and remand this case for the chancellor to consider the pending modification of child custody issue.  I would also order the chancellor to create a remedy to provide Justin a sufficient opportunity to recover the approximately two and one-half years of physical custody that he has missed because of his incarceration.  Also, in the mandate, I would order the sheriff of Grenada County to immediately release Justin from custody.

**KITCHENS AND KING, P.JJ., AND ISHEE, J., JOIN THIS OPINION.**

56